FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

DEC 3 0 2010

Stephan Harris, Clerk
Cheyenne

John Persell (WY #7-4672)
P.O. Box 1512
Laramie, WY 82073
307-742-7978
307- 742-7989 (fax)

Natalie J. Havlina
*Advocates for the West*
P.O. Box 1612
Boise, ID 83701
208-342-7024
208-342-8286 (fax)

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, WILDEARTH GUARDIANS, TOM BELL, and MIKE HUDAK, <br><br> Plaintiffs/Petitioners, <br><br> vs. <br><br> JIM CAGNEY, in his official capacity as Field Manager, Lander Field Office, BLM; and BUREAU OF LAND MANAGEMENT, an agency of the United States, <br><br> Defendants/Respondents. | Case No. 1C CV 284 - F <br><br> **COMPLAINT AND PETITION FOR JUDICIAL REVIEW** |

## **NATURE OF ACTION**

1.    This action challenges the Bureau of Land Management's ("BLM") failure to take appropriate action to address the Fundamentals of Rangeland Health violations that have arisen from improperly managed livestock grazing on one of the most ecologically significant allotments in the State of Wyoming: the Green Mountain Common allotment ("GMCA").

2.    Pursuant to Local Rule 83.7.2(a)(1), this action also petitions the Court for judicial review of BLM's 2008, 2009, 2010, and 2011 annual grazing authorizations, instructions, and operating plans for the GMCA.

3.    The GMCA is one of the largest areas of unfenced land managed by the BLM in the lower 48 states. It provides habitat for a variety of wildlife, ranging from big game herds to the imperiled sage-grouse. In fact, the GMCA has the second-highest lek density in the State of Wyoming and thus is key habitat for this species that is in decline and warranted for protection under the Endangered Species Act

4.    Livestock grazing on the GMCA has degraded its unique resource values and resulted in violations of the minimum requirements set forth in the Wyoming Standards for Healthy Rangelands and Guidelines for Livestock Grazing Management ("Wyoming Standards and Guidelines"). In 2002, BLM determined that the GMCA was not making progress toward achieving these requirements under the grazing practices

prescribed in BLM's 1999 grazing decision ("the 1999 Decision"), triggering a mandatory duty to change grazing practices by the next season to address these problems.

5.      BLM has not fulfilled this duty, however, because it has never taken any appropriate action to ensure that the GMCA makes significant progress toward achieving the Wyoming Standards and Guidelines. Instead, BLM has continued to authorize livestock grazing from 2002 until the present under the 1999 Decision in perpetual violation of the Fundamentals of Rangeland Health regulations, 43 C.F.R. § 4180.

6.      BLM has also violated its duty under the National Environmental Policy Act ("NEPA") to take a hard look at the environmental impacts of its annual grazing authorizations, instructions, and operating plans for the 2008, 2009, 2010, and 2011 grazing seasons. BLM relied on Environmental Assessments ("EAs") from 2008 and 1999 when issuing these annual grazing authorizations, but neither of those EAs satisfies the agency's duty under NEPA. The 2008 EA failed to take a hard look at the environmental impacts of livestock grazing in the GMCA and the 1999 EA is now outdated.

7.      BLM's ongoing failure to address the GMCA's rangeland health problems and its reliance on inadequate NEPA analysis have caused irreparable harm to the GMCA's unique resource values and the Plaintiffs' interests in the allotment. The Plaintiffs accordingly seek judicial review, declaratory relief, and injunctive relief from this Court.

## JURISDICTION AND VENUE

8.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Federal Land Policy and Management Act, 43 U.S.C. § 1301 et seq. ("FLPMA"), the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"); the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.; and the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq. ("EAJA").

9.     An actual, justiciable controversy now exists between Plaintiffs and Defendants. The requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, and Defendants and the affected public lands and resources are located in this judicial district.

11.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 701.

## PARTIES

12.     Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a regional, membership, not-for-profit conservation organization, dedicated to protecting and conserving the public lands and natural resources of watersheds in the American West. WWP has offices throughout the West, including an office in Wyoming. WWP, as an

organization and on behalf of its members, is concerned with and active in seeking to protect and improve the wildlife, riparian areas, water quality, fisheries, and other natural resources and ecological values of watersheds throughout the West, including Wyoming. WWP is also active in reviewing and commenting upon agency grazing decisions; and in publicizing the adverse ecological effects of grazing in this region. WWP has actively participated in the management of the GMCA, and staff and members regularly visit the allotment to observe ecological conditions and document degradation from livestock.

13.     Plaintiff WILDEARTH GUARDIANS is a regional, membership, not-for-profit conservation organization that works to protect the West's rivers, forests, grasslands, deserts, and species from harmful land uses such as logging, ranching, mining, and oil and gas extraction. WildEarth Guardians actively participates in public lands grazing management throughout the West.

14.     Plaintiff TOM BELL is an individual with a long-standing interest in the management of the GMCA. Mr. Bell first visited the allotment upon his return from military service in World War II when he went there to recover from combat experience. He has since returned many times to hunt, hike, and enjoy the wide-open spaces.

15.     Plaintiff MIKE HUDAK is an individual who operates a nonprofit organization (Public Lands Without Livestock) devoted to informing the public about the harms caused by livestock grazing throughout the American West. Mr. Hudak is concerned about degradation to public lands from livestock grazing, including on the GMCA.

COMPLAINT AND PETITION FOR JUDICIAL REVIEW--5

16.     Defendant BUREAU OF LAND MANAGEMENT is an agency or instrumentality of the United States, and is charged with managing the public lands and resources of the Lander Field Office, in accordance and compliance with federal laws and regulations.

17.     Defendant JIM CAGNEY is the Field Manager of the BLM's Lander Field Office, headquartered in Lander, Wyoming; and has legal authority for managing the Green Mountain Common allotment in conformance with federal laws, regulations, and the Lander Resource Management Plan. He is sued solely in his official capacity.

18.     The Plaintiffs and their members and staff frequently visit and use the public lands on the GMCA for many purposes, including scientific study, ecological monitoring, wildlife observation, aesthetic enjoyment, recreation, and work. Plaintiffs and their members and staff derive aesthetic, recreational, scientific, inspirational, educational, and other benefits from this ecosystem on a regular and continuing basis and intend to do so frequently in the immediate future. Livestock grazing that degrades the resources on the GMAC diminishes Plaintiffs' enjoyment when using the allotment.

19.     Defendants' violations of law and failure to manage the public lands within the GMCA in a manner consistent with the mandates of FLPMA adversely and irreparably injure Plaintiffs' aesthetic, commercial, conservational, scientific, recreational, educational, wildlife preservation and other interests. These are actual, concrete injuries to Plaintiffs caused by Defendants violations of law, for which judicial relief is required to remedy the harm caused to Plaintiffs.

## FACTUAL ALLEGATIONS

### The Green Mountain Common allotment.

20.     For administrative purposes, the BLM has divided the 256 million acres of

public land under its care into units it calls "Field Offices." 43 C.F.R. § 1601.0-5. The

Lander Field Office encompasses 6.6 million acres in central Wyoming, including

portions of Carbon County, Fremont County, Natrona Country, Sweetwater County, and

Hot Springs County.

21.     Each field office is divided into grazing allotments. The Green Mountain

Common allotment ("GMCA") is located in the Lander Field Office and covers an area

of 522,290 acres, of which 468,407 acres, or 86%, are public lands managed by BLM.

22.     The GMCA provides unique resource values by virtue of its size, open

space, and riparian systems. Up until the late 1990s, the GMCA was the largest unfenced

BLM area in the lower 48 states. Although a number of riparian pastures have been

fenced off since that time, the GMCA is still free of the type of major fencing that has

carved most BLM allotments into small pieces across the West.

23.     The GMCA's wide-open spaces provide habitat for big game species. The

GMCA forms part of a migration corridor used by elk, mule deer, and pronghorn

antelope to travel from the southern tip of the Wind River Range to winter habitat in the

Red Desert. This corridor has become increasingly important since efforts by the

Wyoming Department of Game and Fish have caused herd populations to rebound.

COMPLAINT AND PETITION FOR JUDICIAL REVIEW--7

24.     The GMCA is also unique by virtue of its riparian system, a network of sloughs whose size and diversity can be found nowhere else in Wyoming. Although riparian areas make up a small percent of the public lands in the West, they are critically important habitat for a large number of species that rely on water and lush vegetation for food and cover.

25.     The GMCA also provides habitat for a wide array of special status species, including the greater sage-grouse and the pygmy rabbit.

**The Greater Sage-Grouse.**

26.     Historically, the greater sage-grouse inhabited every corner of the sagebrush steppe, an ecosystem unique to the American West that once covered some 155 million acres in sixteen western states and three Canadian provinces. Heralded as the symbol of the sagebrush ecosystem, the greater sage-grouse is best known for the courtship or strutting displays male sage-grouse perform during the spring breeding season at historic breeding sites called "leks."

27.     Since the beginning of European settlement, however, the sage-grouse has declined as human activities destroy, degrade, and fragment its sagebrush habitat. Consequently, the sage-grouse now occupies less than half of its historic range.

28.     Because of this decline, scientists have focused much attention on this species. On November 4, 2009, the U.S. Geological Survey announced the early release of a comprehensive monograph prepared by the nation's leading sage-grouse experts

entitled, "Ecology and Conservation of Greater Sage-Grouse: A Landscape Species and Its Habitats" ("the Monograph").

29. Relying largely on information in the Monograph, the U.S. Fish and Wildlife Service announced on March 3, 2010, that the greater sage-grouse is warranted for listing under the Endangered Species Act, but that listing is precluded by higher agency priorities. 12-Month Findings for Petitions to List the Greater Sage-Grouse, 75 Fed. Reg. 13909 (Mar. 23, 2010).

30. More than half of the remaining sage-grouse in the United States live in Wyoming, thousands of them on the GMCA. The GMCA contains sage-grouse winter habitat and the allotment has the second-highest lek density in the state of Wyoming. No less than thirty-eight leks occur within the current boundaries of the GMCA, and that number climbs to more than sixty leks when considering all leks within four miles of the GMCA's boundaries.

## Resource Uses on the GMCA.

31. Livestock grazing has long been the primary consumptive use on the GMCA. Between 1980 and 2006, BLM authorized an average use of 23,811 Animal Unit Months ("AUMs") on the GMCA per year, ranging from a low of 7,735 AUMs in 2002 to a high of 34,903 AUMs in 1994. An Animal Unit Month is the amount of forage that one cow/calf pair is estimated to eat in one month.

32. In addition to livestock grazing, energy development and mining also have the potential to impact large portions of the allotment. As of 2006, BLM had issued 378

COMPLAINT AND PETITION FOR JUDICIAL REVIEW--9

oil and gas leases on the GMCA covering 247,387 acres, or 48 percent, of the allotment. Six of the seven coalbed methane exploration areas in the Lander Field Office are located in the GMCA. These exploration areas cover 46,090 acres, or nine percent, of the allotment.

33. BLM is also considering four separate applications to construct wind farms on the GMCA, as well as applications to construct meteorological towers. If approved, the area affected by the leases would cover 150,713 acres of the land within the GMCA, or twenty-nine percent of allotment.

34. There are 1044 active mining claims on the GMCA covering 243,107 acres, or 47 percent of the allotment. 39,042 acres, or 8 percent of the GMCA's surface area, are currently being mined or are in the permitting process. Of the 20 active uranium mining operations in the Lander Field Office, thirteen are located in the GMCA.

**Grazing Regulation on BLM Lands.**

35. BLM's management of the federal public lands is governed by the Federal Land Policy and Management Act ("FLPMA)." Pursuant to FLPMA, BLM must develop a land use plan for each of its Field Offices. Site-specific resource management decisions, such as grazing authorizations, must conform to the governing land use plan. 43 C.F.R. § 1610.5-3(a).

36. Management of public lands in the Lander Field Office is governed by Lander Resource Management Plan (1986) ("the Lander RMP"). The Lander RMP requires BLM to develop Allotment Management Plans ("AMPs") for livestock grazing

allotments classified as "Improvement." The Lander RMP classified 80 allotments that were failing to achieve their resource objectives as "Improvement" allotments.

37. The GMCA was classified as an "Improvement" allotment and ranked 13th out of the allotments in this category "based on the significance of management problems identified in the allotments." Record of Decision for the Lander Resource Management Plan, 86 (June 6, 1987).

38. Grazing on BLM lands is also regulated by the grazing regulations BLM adopted in 1995. Pursuant to the grazing regulations, BLM must maintain the lands within its care in an ecological condition consistent with state-specific criteria developed under the Fundamentals of Rangeland Health regulations. 43 C.F.R. § 4180.1. In Wyoming, BLM lands must achieve conditions described in the Wyoming Standards for Healthy Rangelands and Guidelines for Livestock Grazing Management ("Wyoming Standards and Guidelines").

**Rangeland Health on the GMCA.**

39. By the 1990s, grazing practices on the GMCA had resulted in chronic overgrazing and environmental degradation. BLM set up a working group composed of permittees, the interested public, conservationists, and agency staff with the goal of increasing public awareness and giving the public an opportunity to participate in the management of the GMCA. Members of the working group who favored protection of the GMCA's unique resource values found that their suggestions were ignored.

40. On July 23, 1999, BLM issued a rangeland health determination documenting that resource conditions on the GMCA were not achieving the minimum standards set forth in the Wyoming Standards and Guidelines. Specifically, BLM documented that the allotment was not meeting standards for soils, wetland vegetation, upland vegetation, or viable species populations, with riparian conditions being "the biggest rangeland health issue" for the GMCA. Livestock grazing was identified as a significant factor.

41. BLM subsequently issued a Final Decision renewing six grazing permits and authorizing grazing for the period of October 1, 1999-September 30, 2009 ("the 1999 Decision"). The 1999 Decision contemplated the development of an Allotment Management Plan (AMP) and divided the GMCA into 5 "Use Areas," each with its own grazing rotation system and "grazing treatments."

42. After implementing the 1999 Decision for four years, BLM issued an update of the 1999 Rangeland Standards Conformance Review and determined that the allotment still did not meet and was not making significant progress toward meeting the Wyoming Standards and Guidelines due to livestock grazing. Riparian conditions remained the biggest issue on the allotment.

43. Despite these findings, BLM continued to authorize livestock grazing on the GMCA under the terms of the 1999 Decision.

**The 2005 Settlement Agreement.**

44.     In 2005, BLM found that the GMCA still had not made any significant progress towards satisfying the Wyoming Standards and Guidelines.

45.     Although it had not issued an AMP for the allotment, BLM renewed two ten-year grazing permits. WWP, National Wildlife Federation, the Wyoming Outdoor Council, and Wyoming Wildlife Federation appealed the issuance of these permits to the Department of the Interior's Office of Hearings and Appeals ("OHA") on the grounds that they contained no mechanism to enforce the limits set forth in the 1999 Final Decision.

46.     BLM persuaded the conservation groups to settle their appeals by promising to prepare an AMP for the GMCA. The Stipulated Request for Dismissal that provided the basis for the dismissal of the 2005 appeal stated, "BLM hereby represents that it will issue a new allotment management plan (AMP), along with a proposed decision for implementation of the AMP, no later than December 31, 2007."

**The 2010 Decisions.**

47.     Despite its promise to prepare an AMP for the GMCA by the close of 2007, BLM did not complete its NEPA analysis for the AMP until April of 2008.

48.     The 2008 EA contained several alternative actions for livestock grazing on the allotment, but did not analyze whether the implementation of these various alternatives would correct the allotment's rangeland health violations. BLM's experts did

COMPLAINT AND PETITION FOR JUDICIAL REVIEW--13

not offer an opinion as to whether the various alternatives would result in significant progress toward rangeland health compliance.

49. It took BLM yet another year to issue proposed decisions for the renewal of the ten-year permits that authorize grazing on the GMCA. On April 3, 2009, BLM issued three Proposed Decisions for the renewal of the GMCA's grazing permits.

50. None of the proposed decisions included an AMP for the GMCA. WWP protested the Proposed Decisions on May 11, 2009 on the grounds that the 2008 EA was inadequate and the proposed decisions would not result in significant progress toward rangeland health compliance. WWP also protested BLM's failure to comply with the terms of the 2005 settlement agreement by not preparing an AMP. BLM denied WWP's protests in full.

51. On March 3, 2010—nearly two years after the issuance of the 2008 EA— BLM issued new final grazing decisions for the GMCA. Rather than issuing the promised AMP, however, BLM issued three Final Decisions dividing the GMCA into three new allotments: the new Green Mountain allotment, the Antelope Hills allotment, and the Arapahoe Creek Common allotment.

52. Under the 2010 Decisions, grazing on both the new Green Mountain allotment and the Arapahoe Creek Common allotment would have continued to be governed by the 1999 Decision with certain modifications. The new Antelope Hills allotment would have been grazed under a modified, four-pasture deferred-rotation grazing system. None of these three allotments would have been covered by an AMP.

COMPLAINT AND PETITION FOR JUDICIAL REVIEW--14

53.    The 2010 Decisions also authorized the construction of an additional 32 miles of fencing on the new Antelope Hills and Arapahoe Creek Common allotments.

**Proceedings Before the Office of Hearings and Appeals**.

54.    On April 6, 2010, WWP, WildEarth Guardians, Tom Bell, Mike Hudak, and other concerned individuals filed an administrative appeal of the 2010 Decisions with the Department of the Interior's Office of Hearings and Appeals. The appeal claimed that the 2010 Decisions violated NEPA, the Fundamentals of Rangeland Health, the Lander RMP, BLM's Special Status Species Policy, the National Historic Preservation Act, and the 2005 Settlement Agreement.

55.    Josh Anderson, a permittee on the east side of the GMCA, also filed an administrative appeal. The two appeals were assigned to Administrative Law Judge Harvey Sweitzer and consolidated.

56.    WWP and its co-appellants also petitioned to stay the construction of the new fences authorized by the 2010 Decisions. On May 19th, Administrative Law Judge Sweitzer issued an order finding that the appellants were likely to prevail on their NEPA claims and granted the petition for stay.

57.    BLM then moved to remand the 2010 Decisions. BLM represented that it would withdraw the 2010 Decisions, conduct a new "environmental analysis" for the GMCA, and ultimately issue new final decisions. BLM did not explain why it was requesting a remand or indicate whether it would belatedly fulfill its promise to prepare

an AMP. BLM likewise refused to explain what new NEPA analysis, if any, it intended to prepare.

58.     The appellants opposed BLM's motion for remand on the grounds that allowing livestock grazing to continue on the GMCA would perpetuate BLM's longstanding and repeated violations of the Fundamentals of Rangeland Health. The appellants further argued that remand was inappropriate because BLM was already implementing the 2010 Decisions through its 2010 operating plan for the GMCA.

59.     On June 25, 2010, ALJ Sweitzer granted BLM's motion to remand the 2010 Decisions and vacated these 2010 Decisions in their entirety. ALJ Sweitzer did not vacate the 2010 annual operating plan or issue any instructions to govern livestock grazing in the interim while BLM was preparing a new environmental analysis and grazing decision for the GMCA.

**The 2010 Operating Plan and Grazing Authorizations.**

60.     On April 27, April 28, May 2, and May 25, BLM met with the GMCA permittees to discuss the pasture rotation sequences and season of use for the 2010 grazing season. Neither WWP nor any other interested public was informed of these meetings.

61.     Although BLM had not yet issued annual instructions or billing statements for the 2010 grazing season, the permittees turned their livestock out on April 15, 2010.

62.     On June 11, 2010—two days **before** it moved to remand the 2010 Decisions—BLM issued a 2010 operating plan for the GMCA.

63. Because the 2010 operating plan was not issued until well after turnout,

"grazing bills [were] issued to the permittees based on actual livestock numbers and

spring turnout dates."

64. The 2010 operating plan states,

> This operating plan was originally based on my March 3, 2010 final
> decisions and our meetings on April 27-28, May 3 and 25, 2010. It has
> been modified further because of the major snow and rain storms that have
> occurred in May that have delayed your branding and turnouts and the
> May 19, 2010 Order issued by Administrative Law Judge, Harvey C.
> Sweitzer.

65. Like the 1999 Decision, the 2010 operating plan required the permittees to

"keep their livestock within the planned use area and pasture(s) during the prescribed

grazing treatment (period)." The 2010 operating plan anticipates that some livestock

"drift" will occur.

66. Also like the 1999 Decision, the 2010 operating plan required the

permittees to maintain a 4-6 inch stubble height in key riparian areas.

67. In addition, the 2010 operating plan authorized the construction of an

unspecified amount of temporary fencing upon verbal approval by BLM.

**Impacts of BLM's Mismanagement.**

68. During the 2010 grazing season, BLM continued to turn a blind eye to

instances of trespass. Trespass on the GMCA has routinely exceeded 20 percent and

WWP's members have observed as many as 50% of a Use Area's allotted number of

cattle in the wrong pasture at the wrong time. BLM also failed to require the permittees

to move their livestock when the 4- or 6- inch stubble height prescribed in the 2010 operating plan has been reached.

69. As a result, the allotment's rangeland land health has continued to deteriorate, particularly in riparian areas.

70. BLM has not initiated scoping or consultation, cooperation, and coordination with the interested public for the development a new grazing decision for the GMCA. Given the complexity of the issues affecting grazing management on the GMCA and the requirements for public participation, it would be impossible for BLM to develop a new grazing decision for the GMCA with an adequate supporting Environmental Impact Statement ("EIS") before the beginning of the 2011 grazing season.

71. The Plaintiffs are thus informed and believe, and allege thereon, that BLM will continue to authorize livestock grazing on the GMCA during 2011 based on the 1999 Decision. These longstanding grazing practices will further degrade the GMCA's rangeland health and accelerate the decline of the greater sage-grouse.

72. The Plaintiffs allege on information and belief that BLM will again authorize grazing in 2011 without taking appropriate action to improve rangeland health and without preparing new NEPA analysis to consider the wealth of significant new information about the sage-grouse published since 2008.

73. A just and speedy determination of the Plaintiffs' claims, including appropriate declaratory and/or injunctive relief, is necessary to prevent still greater harm

to the riparian areas, sage-grouse populations, and other resource values of the GMCA during the upcoming 2011 and future grazing seasons.

74. The Plaintiffs accordingly seek judicial review of the BLM's violation of the Fundamentals of Rangeland Health and NEPA.

### FIRST CLAIM FOR RELIEF:
### VIOLATION OF THE FUNDAMENTALS
### OF RANGELAND HEALTH

75. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

76. This First Claim for Relief challenges the Defendants' failure to take appropriate action to ensure that the GMCA achieves compliance with the Wyoming Standards and Guidelines on the GMCA during the 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, and 2011 grazing seasons as required by the Fundamentals of Rangeland Health, 43 C.F.R. § 4180 et seq. This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

77. When BLM determines that an allotment is failing to achieve rangeland health standards and guidelines due to grazing levels or practices, "[t]he authorized officer shall take appropriate action as soon as practicable but not later than the start of the next grazing year . . . that will result in significant progress toward fulfillment of the standards." 43 C.F.R. § 4180.2(c).

78. In 2002, BLM determined that livestock grazing on the GMCA was causing violations of the Wyoming Standards and Guidelines and continued

implementation of 1999 Decision would not ensure significant progress toward the achievement of these standards and guidelines.

79.     BLM's 2002 determination triggered a mandatory duty to take appropriate action by the beginning of the next grazing season. Rather than implementing changes in grazing management as required by 43 C.F.R. § 4180.2(c), BLM has continued to authorize livestock grazing under the terms of the 1999 Decision from 2003 until the present.

80.     Under the APA, the Defendants' failure to take appropriate action as required by the Fundamentals of Rangeland Health regulations constitutes agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1). In addition, the Defendants' failure to take appropriate action violates the Fundamentals of Rangeland Health regulations and is therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law.

81.     Defendants' failure to take appropriate action and violation of the Fundamentals of Rangeland Health has caused and will continue to cause serious prejudice and injury to Plaintiffs' rights and interests.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CLAIM FOR RELIEF:
## VIOLATION OF THE
## NATIONAL ENVIRONMENTAL POLICY ACT

82.     Petitioners reallege and incorporate by reference the preceding paragraphs.

83.     This Second Claim for Relief challenges the Defendants' violations of the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq. ("NEPA") in authorizing livestock grazing on the GMCA in 2008, 2009, 2010, and 2011 without any current and legally valid environmental analysis as required by NEPA.  This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

84.     NEPA requires all federal agencies to undertake a thorough and public analysis of the environmental consequences of proposed federal actions, including a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  Such analysis must include consideration of the cumulative effects of the likely environmental impacts of a proposed action. See 40 C.F.R. §§ 1508.7; 1508.25(a)(2).

85.     The issuance of annual grazing instructions constitutes final agency action under the APA. *Center For Native Ecosystems v. Cables*, 509 F.3d 1310, 1329-31 (10th Cir. 2007).

86.     Neither the 1999 EA nor the 2008 EA adequately analyzes or takes a hard look at the impacts of livestock grazing on the GMCA.  The 1999 EA is outdated.  The 2008 EA failed to consider an adequate range of alternatives or the cumulative impacts of livestock grazing in association with past, present, and reasonably foreseeable future actions, including the impacts of ongoing and/or reasonably foreseeable energy development and mining activities on the GMCA.

87. Furthermore, the GMCA is a unique geographic area and the impacts of permitting livestock grazing there are both significant and highly controversial. Consequently, an EIS rather than an EA is required to analyze the full impacts of livestock grazing. BLM is relying on inadequate NEPA analysis to authorize grazing on the GMCA.

88. The annual authorizations, instructions, and operating plans BLM issued for the GMCA from 2003 to 2011 are thus arbitrary, capricious, an abuse of discretion, and contrary to law, and must be reversed and remanded under the APA, 5 U.S.C. § 706 et seq; and injunctive and declaratory relief is appropriate to enjoin any further implementation of the operating plan and authorizations pursuant to F. R. Civ. P. 65 and 28 U.S.C. §§ 2201-02.

WHEREFORE, Petitioners pray for relief as set forth below.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court grant the following relief:

A. Order, adjudge, and declare that the Defendants violated the Fundamentals of Rangeland Health in failing to take appropriate action to ensure that the GMCA makes significant progress toward achieving the Wyoming Standards and Guidelines prior to authorizing livestock grazing during the 2003, 2004, 2005, 2006, 2007, 2008, 2009, and 2010 grazing seasons;

B.     Order, adjudge, and declare that the Defendants violated NEPA in relying

on inadequate NEPA analysis for the 2008, 2009, 2010, and 2011 annual grazing

authorizations, plans and instructions;

C.     Enter other such temporary, preliminary, or permanent injunctive relief as

the Plaintiffs may hereafter specifically seek;

D.     Award Plaintiffs their reasonable costs, litigation expenses, and attorney's

fees associated with this litigation and the related administrative proceedings pursuant to

the Equal Access to Justice Act, 28 U.S.C. §§ 2412 et seq., and/or all other applicable

authorities; and/or

E.     Grant such further relief as the Court deems necessary or appropriate to

redress the BLM's legal violations and protect the public lands and resources of the

GMCA from further degradation.

Dated this 30th day of December, 2010.              Respectfully submitted,

John Persell
P.O. Box 1512
Laramie, WY 82073
307-742-7978
307- 742-7989 (fax)
Attorney for Plaintiffs